UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

KEVIN McCLINTON,

                    Petitioner,          **MEMORANDUM & ORDER**
                                          21-CV-5222(EK)

          -against-

SUPERINTENDENT JOHN WOOD,[1]

                    Respondent.

-------------------------------------x
ERIC KOMITEE, United States District Judge:

## I.    Introduction

          Petitioner Kevin McClinton seeks a writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  McClinton was convicted of

one count of second-degree murder and two counts of criminal

possession of a weapon in connection with the 2013 shooting of a

teenage girl in Queens County.  The state Supreme Court Justice

who presided over McClinton's trial sentenced him to twenty-five

years to life in prison on the murder charge.  McClinton has

since served nine of those years; he is currently incarcerated

at the Shawangunk Correctional Facility in Wallkill, New York.

---

[1] John Wood is now the superintendent of Shawangunk Correctional
Facility.  The Court has therefore substituted him in Jaifa Collado's place
as the proper defendant.  Fed. R. Civ. P. 25(d).  The Clerk of Court is
respectfully directed to update the docket to reflect the amended case
caption.

Proceeding *pro se*,[2] McClinton raises four arguments in his petition.  Most notably, he argues that prosecutors violated their disclosure obligations under *Brady v. Maryland* by, among other things, refusing to reveal the name of Lael Jappa.

Jappa testified for the prosecution at McClinton's 2016 trial, telling the jury that he saw McClinton take a gun from another person who was shooting in the girl's direction — Shamel Capers — and then heard several additional shots after he turned to flee the scene. —.  Years prior, however, Jappa had spoken with officers of the New York City Police Department.  The N.Y.P.D. memorandum of Jappa's May 19, 2013 interview — first revealed to McClinton in 2024, in response to this Court's order — records Jappa's statement that he "did not see who was shooting" during the events in question.  A second N.Y.P.D. report, also dated May 19, 2013 (but again produced only 2024 after my directive), indicated that Jappa had picked Capers (not McClinton) out of a photo array.  The district attorney's office had expressly declined to share Jappa's identity with McClinton prior to trial.  Respondent now asserts that such disclosure was not required because prosecutors had charged McClinton under an

---

[2] After oral argument in this case, McClinton filed a letter seeking to amend his petition based on evidence that a witness (Lael Jappa) had recanted his testimony.  *See* ECF No. 18.  The Court appointed counsel for the limited purpose of determining whether any relief, including a stay or an amendment to the original petition, was appropriate given McClinton's request.  ECF No. 23.  Counsel ultimately informed the Court that McClinton wished to proceed with his original petition, and has taken no further part in this case.  ECF No. 28.  The Court therefore treats McClinton as proceeding *pro se*.

"acting-in-concert theory," meaning he would have been equally liable whether he *or* a compatriot — such as Capers — had pulled the trigger.

In addition to several other *Brady* objections, McClinton further argues that:

- The evidence at trial was insufficient to support his convictions;

- He was deprived of a fair trial by the introduction of "inflammatory" evidence and improper prosecution summations; and

- His sentence was excessively long.

*See* Petition 5-8, ECF No. 1.

For the following reasons, the petition must be denied, notwithstanding the serious questions raised by the prosecutors' refusal to disclose information about Jappa at an earlier date.

## II. Background

On May 18, 2013, a fourteen-year-old girl named D'Aja Robinson was shot and killed while sitting in a New York City bus in South Jamaica, Queens.  Robinson was the victim of a dispute between rival gangs.

McClinton was arrested for the killing approximately two weeks later and indicted shortly thereafter.  Though he was the only defendant charged in the operative indictment, the grand jury alleged that he committed Robinson's murder while

"acting in concert with other persons." Indictment 1-2, ECF No. 13-2. The weapons-possession charges were also alleged to have been the product of action in concert — a theory of accomplice liability under New York State law. *Id.; see also People v. Scott*, 35 N.E.3d 476, 477 (N.Y. 2015) (citing N.Y. Penal Law § 20.00) (under acting-in-concert theory, accomplice is liable when, "acting with the mental culpability required for the commission of the crime," he "solicits, requests, commands, importunes, or intentionally aids the principal to engage in the commission of the crime").[3]

## A.    Pretrial Proceedings

### 1.    McClinton's Motion to Compel Disclosure

In October 2014, eighteen months before trial, McClinton's trial counsel moved to compel the prosecution to disclose the names of two witnesses pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Pet. Mot. to Compel 3, ECF No. 11. McClinton's counsel said he had recently discovered that the Queens District Attorney's Office had also charged Shamel Capers with Robinson's murder — albeit in a separate case. *Id.* at 2.[4] And in that case, the People had filed a Section 710.30

---

[3] McClinton was also charged with reckless endangerment and depraved indifference, but the People moved to dismiss these counts prior to the close of trial, and the court granted those motions. Tr. 909:12-910:3.

[4] McClinton was indicted under Indictment No. 1725/2013, while Capers was indicted separately under Indictment No. 1003/2015. *See id.* at 1 (McClinton); Notice of Intent to Offer Witness Testimony 1, ECF No. 11 (Capers).

notice identifying two witnesses (albeit not by name) who had identified Capers as the shooter.  710.30 Notice 1, ECF No. 16-1.[5]  The first identification occurred on June 4, 2013, in a "confirmatory procedure" at the "Lexington County Sheriff's Office, South Carolina" to an NYPD detective.  *Id.*  The second was made to the same detective on July 21, 2014, in response to a "photo array" on the "1st floor of 125-01 Queens Blvd."  *Id.*

McClinton argued, based on the 710.30 notice, that the "existence of witnesses who point to Shamel Capers as the person who fired the shot that killed [D'Aja] Robinson" was subject to disclosure under *Brady*.  Pet. Mot. to Compel 2-3.  He asked Justice Lasak to compel the People to disclose the names of the two witnesses identified.  *Id.* at 3.

In response, the People identified the first witness as McClinton himself.  People's Resp. to Mot. to Compel 2, ECF No. 11.  McClinton, they reported, had named Capers as the shooter after his initial arrest in South Carolina.  *Id.*  The People declined to identify the other witness, arguing that because the state was prosecuting McClinton and Capers under an acting-in-concert theory, one defendant's culpability would not

---

[5] Section 710.30 notices are required by New York law.  N.Y. Crim. Proc. § 710.30.  "Whenever the people intend to offer at a trial . . . testimony regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the case," they are required to provide the defendant with notice of that intention and to specify "the evidence intended to be offered." *Id.* § 710.30(1).  The notice must be provided within fifteen days after arraignment.  *Id.* § 710.30(2).

tend to exculpate the other.  *Id.* at 2-3.  Justice Lasak ultimately agreed with the People and denied McClinton's motion. Order Denying Mot. to Compel 1, ECF No. 8.

The name of the second witness was never disclosed during the pendency of the state-court litigation, including on direct appeal.  In 2024, however, at the direction of this Court, Respondent revealed that the witness was Lael Jappa. Resp. Aug. 9, 2024 Ltr. 2, ECF No. 16.  Jappa did actually testify at McClinton's trial — for the prosecution.  During his testimony, he said that he saw Capers shoot first, that McClinton took the gun from Capers' hand, and that he (Jappa) heard "[a]bout three" additional shots after he turned to flee the scene.  Jappa 227:1-4, 228:12-23, 230:7-16, ECF No. 16-4.[6] McClinton now argues that the state's failure to disclose Jappa's name during the state proceedings violated *Brady*.

2.    The April 14, 2016 Pretrial Conference

Justice Lasak held a pretrial conference on April 14, two days before jury selection.  *See generally* Pretrial H'ing Tr., ECF No. 8-1.[7]  There, the People disclosed the names of two additional *Brady* witnesses — Janiah Gulley and Supreme Moye —

---

[6] Citations to "Tr." denote non-testimonial portions of the trial record.  Citations to a name indicate testimony given by that witness during the trial before Justice Lasak on April 25 through May 9, 2016.

[7] This Order will refer to the transcript from the April 14, 2016 hearing as "Pretrial H'ing Tr."  The transcript begins at page 125 of ECF No. 8-1.  The Court will hereafter cite to the transcript using its native pagination, rather than the pagination of ECF No. 8-1.

separate and apart from the 710.30 notice. *Id.* at 3:14-24, 4:24-5:6. Gulley, a teenager who was on the bus on the night of the crime, had previously identified McClinton's brother — Nathaniel Parker — as the shooter in a police photo array. *Id.* at 3:14-25. As for Moye, an incarcerated man named Terry Baboolal had informed a detective that Moye admitted to having "fired some shots" at "that 6 bus shooting." *Id.* at 4:15-5:6.

Gulley ultimately testified at trial as a defense witness. Moye did not. In his petition, McClinton argues the People should have disclosed Moye's and Gulley's names earlier, and that the decision to do so on the "eve of trial" violated *Brady*. *See* Petition 5, 7 (citing Pet.'s App. Br. 44-52, ECF No. 8-6).

## B. The Trial

### 1. The People's Opening Statement

Trial began on April 25, 2016 before Justice Lasak. Assistant District Attorney Patricia Theodorou opened for the People. Tr. 8:9-13, ECF No. 8-4. She referred to Robinson's "devastating, violent death" from a bullet that "ripped into the right side of her head" and "ripped into her brain." Tr. 10:5-6. She foreshadowed testimony, from the victim's mother, that Robinson "liked little kids and liked music and liked to sing." *Id.* 10:17-21; Sands 37:16-18. And she repeatedly referenced Robinson's age, noting that she "never got to have her own Sweet

[Sixteen] party."  Tr. 10:10-11; *see also id.* at 8:15, 17:6, 23:24 (additional references to Robinson's age).  Though McClinton now argues that both this statement and the testimony it referenced were improperly inflammatory, the defense raised no contemporaneous objection.

    2.   The People's Case-in-Chief

In its case-in-chief, the People relied largely on two types of witnesses: (1) witnesses from the scene of the crime, including Lael Jappa; and (2) law enforcement officers.

    a.  Lael Jappa

Jappa and another witness named Shaquan Bryant first encountered McClinton that day in Rochdale Park.  Jappa 211:8-25, 214:2-12; Bryant 728:7-20, 729:18-730:15.  The three were members of allied local gangs.  Jappa 214:13—215:8; Bryant 726:8-22.  Jappa told the jury that McClinton was with Shamel Capers, whom he introduced as his "drop," or gang subordinate.  Jappa 215:22-216:11; *see also* Bryant 730:2-731:23.  Bryant then received a phone call from a fellow gang member, who said members of a *rival* gang — Wood City — were nearby, at a Sweet Sixteen celebration at Club Onyx.  Bryant 727:11-21, 734:12-24, 784:11-15.  McClinton and Capers headed to Club Onyx.  Jappa 219:15-220:1; Bryant 735:2-13.

Jappa testified that he, too, headed to Club Onyx, but it had closed by the time he arrived.  Jappa 221:1-222:9.  He

then walked to the Q6 bus stop, *id.*, where he recognized
Robinson through the bus window, *id.* at 224:11-225:2.  As he
walked toward the bus, he heard someone say "blow that" (which
he took to mean "shoot"), and then heard gunshots behind him.
*Id.* at 225:23-226:14.  When he turned around, he saw "Mel
[Capers] shooting a gun" toward the back of the bus, firing
"three to four" times.  *Id.* at 226:25-227:7, 230:2-4.  He then
saw McClinton — who had a bandana over his mouth — "snatch the
gun out of [Capers's] hand."  *Id.* at 228:12-15, 229:15-24.
Jappa testified that he "couldn't clearly see [McClinton]" fire,
because he ran after McClinton grabbed the gun.  *Id.* at
228:22-24.  But he saw McClinton grab the gun, and then heard
"[a]bout three shots more" after he turned to run.  *Id.* at
229:4-9, 230:14-16.

   Jappa's testimony at trial was in tension, at least,
with certain of the earlier statements he had made to N.Y.P.D.
officers.  According to police interview reports from May 2013 —
which were only disclosed at the Court's request in 2024 — Jappa
told officers that he "did not see who was shooting" and had
only "heard gun shots."  *See* ECF Nos. 16-2, 16-3.  And in July
2014, Jappa identified Capers (but not McClinton) in a photo
array.  ECF No. 19-1.  At the trial, when both the prosecution
and defense counsel asked Jappa about his May 2013 statements to

police, he admitted that he had "lied," Jappa 276:13-14, and "not [told] the police what [he] saw that day[.]" *Id.* 238:7-9.

> b.   Other Witnesses at the Scene

The prosecution called two other cooperating witnesses — Bryant and Terrance Payne — to describe the events surrounding Robinson's killing.

Payne also tried unsuccessfully to get into Club Onyx. Payne 622:7-14.  He saw Robinson and another girl (Sierra Orival) leave the corner by Club Onyx and head toward the Q6 bus stop at the corner of Sutphin and Rockaway Boulevards.  *Id.* at 625:10-24.  He headed towards the same bus stop.  *Id.* at 626:9-19.  A second group then approached him.  *Id.* at 629:9-14. One man from the group, who wore a face covering and held a gun, asked Payne if he was "with Wood City."  *Id.* at 629:15-18, 631:2-11.  Payne said no, and the group headed for the bus stop. *Id.* at 631:10-15, 632:10-25.  As he walked toward the bus, Payne heard the first shots.  *Id.* at 634:24-635:6.  Payne testified that McClinton (who he identified in court) was the "person shooting" into the bus.  *Id.* at 636:4-24.  He also said he watched McClinton flee into the park after the shooting.  *Id.* at 637:24-25.  Payne was the only witness to testify that he actually saw McClinton fire in the direction of the bus.

Bryant, who had stayed in the park, testified that he met McClinton there later that night.  Bryant 737:15-17.

According to Bryant, McClinton told him that he had seen Orival sitting on the bus "throwing up" Wood City gang signs. *Id.* at 738:2-20. Bryant further testified that McClinton told him Capers "started shooting," and that McClinton then "took the gun away from him and started shooting" himself. *Id.* at 739:10-12. Bryant did not testify that he witnessed McClinton or Capers fire into the bus.

c.   Law Enforcement Witnesses

NYPD Detective Peter Galasso was among the police officers who subsequently investigated the shooting. Galasso 469:9-18. He testified that, with help from federal marshals, he tracked down McClinton and arrested him at his aunt's home in South Carolina. *Id.* at 486:2-7; Rao 436:3-23, 440:11-443:3. During a subsequent interview at a South Carolina police precinct, McClinton initially told Detective Galasso that Capers was the sole shooter. Galasso 497:16-20, 508:2-4. Upon further questioning, McClinton admitted that he "actually did fire the gun that day," but maintained that although Capers "handed him the firearm, he fired two to three times into the air," rather than at the bus itself. *Id.* at 519:8-24.

\*          \*          \*

In sum, only one government witness (Payne) testified at trial that he saw McClinton fire into the bus. Jappa testified that saw Capers shooting and heard subsequent shots as

11

he turned his back; Bryant testified that he heard McClinton
confess to the shooting later in Rochdale Park; and N.Y.P.D.
officers testified that McClinton admitted to shooting into the
air.

    3.   <u>The Defense Case</u>

       McClinton's counsel called Janiah Gulley — one of the
witnesses the People had disclosed at the April 14 pretrial
conference.  *See supra* Section II.A.2.

       Gulley testified that she witnessed the shooting, but
that she did not know who fired first because it was too dark.
Gulley 802:14-17, 803:16-19.  On direct, she confirmed that she
had previously identified a "guy" as the shooter in a police
photo array.  *Id.* at 804:18-21, 806:4-6, 810:20.  But she
testified that she did not "remember the name" of this "guy,"
only "the picture."  *Id.* at 806:6, 810:20.  She denied having
identified the shooter to the police by name, and said nothing
could refresh her memory about the initial identification.  *Id.*
at 865:22-866:18.

       Because Gulley claimed not to know the name of the
person she had identified, the defense called the detective who
had interviewed her, Anthony Faranda.  Detective Faranda
testified that Gulley had identified Nate Parker, McClinton's
half-brother, as the shooter.  Faranda 883:22-884:1.  Neither
party contended that Parker was actually the shooter.  The

defense indicated, outside the presence of the jury, that despite having the opportunity to do so, they would not call Parker to testify.  Tr. 888:10-11.  Instead, they called his girlfriend, Aaliyah Watson.  Her testimony, uncontroverted at trial, was that Parker was not at the scene when the shooting occurred.  Watson 838:24-839:18.

Finally, the defense called Richard Thomas, an MTA bus driver.  He testified that upon arriving at the stop he saw muzzle flashes and heard gunshots, but not the shooter's face: when asked whether he saw "the person holding the gun," he responded that "[i]t was dark."  Thomas 817:5-12.  He also did not see what the shooter was wearing (again because of the darkness).  *Id.* at 821:1-6.

4.  Closing Arguments

ADA Theodorou delivered closing arguments for the prosecution.  Tr. 932.  Once more, she repeatedly invoked Robinson's age.  *See, e.g.*, *id.* at 932:19, 933:7, 933:23, 934:11, 934:23.  She again referred to the graphic nature of Robinson's head wound.  *Id.* at 961:23-962:1.  And she again invoked the grief of Robinson's mother, stating that she "did not deserve" to bury her daughter, who "should be getting ready to go off" to college.  *Id.* at 932:18-19, 933:1-2.  Theodorou also called back to Sands' testimony about her grief, such as the statement that when she saw Robinson's dead body, she

"climbed on the table trying to squeeze her daughter back to life." *Id.* at 936:19-25.

### 5.   Verdict and Sentencing

The jury returned a verdict of guilty on all counts — second-degree murder and two counts of second-degree weapon possession.[8]  Tr. 1028:7-1029:23.  On the murder count, Justice Lasak sentenced McClinton to an indeterminate sentence of twenty-five years to life.  Sentencing Tr. 19:22-25, ECF No. 8-5.  On each of the possession counts, Justice Lasak sentenced McClinton to a determinate sentence of fifteen years to be followed by five years of post-release supervision.  *Id.* at 19:14-22.  Justice Lasak ran the murder count and the first weapon-possession count concurrently, but ran the second possession count consecutively, such that McClinton's aggregate sentence amounted to forty years to life.  *Id.* at 20:1-4.

## C.   Appeal and Collateral Proceedings

McClinton appealed his conviction and sentence to the Second Department, making the same arguments he now presents on collateral review.  *People v McClinton*, 180 A.D.3d 712 (2d Dep't 2020).  The Second Department affirmed the conviction on February 5, 2020.  *Id.* at 715.  It held that the evidence was sufficient to convict him; that his *Brady* objections were

---

[8] The first possession charge concerned possession of a weapon with intent to use it, while the second concerned possession of a weapon outside one's home or place of business.  *See* Indictment 3.

meritless; that he had failed to preserve objections to the introduction of inflammatory evidence or improper argument; and that excluding the allegedly inflammatory evidence or argument would not, in any case, have altered the outcome of his trial. *Id.* at 712-14. However, the Second Department also held that Justice Lasak had improperly run McClinton's second weapon-possession sentence consecutive to his other sentences, and therefore modified that sentence to run concurrently. *Id.* at 715. It held that McClinton's sentence was not otherwise excessive under New York law. *Id.*

McClinton's application for leave to appeal to the New York Court of Appeals was denied on June 24, 2020. *People v. McClinton*, 35 N.Y.3d 1028 (2020). McClinton's conviction became final ninety days later, on September 22, 2020. *See McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003). He filed this petition on September 14, 2021, within the one-year statute of limitations set out by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* 28 U.S.C. § 2244(d)(1).

### III. Legal Standard

An application for a writ of habeas corpus by a person in state custody is governed by 28 U.S.C. § 2254. Under AEDPA, a petitioner challenging a determination that was "adjudicated on the merits" in state court must demonstrate that the state decision "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined
by the Supreme Court of the United States," 28 U.S.C.
§ 2254(d)(1), or was "based on an unreasonable determination of
the facts in light of the evidence presented in the State court
proceeding." *Id.* § 2254(d)(2).

A legal conclusion is "contrary to" clearly
established federal law if it "contradicts the governing law set
forth in" the Supreme Court's cases or "confronts a set of facts
that are materially indistinguishable from a decision" of the
Supreme Court, yet "arrives at a result different from [that]
precedent." *Price v. Vincent*, 538 U.S. 634, 640 (2003).[9]  And a
decision involves an "unreasonable application" of federal law
"if the state court identifies the correct governing legal
principle" in the Supreme Court's decisions but "unreasonably
applies that principle to the facts of the prisoner's case."
*Williams v. Taylor*, 529 U.S. 362, 413 (2000).  It is the
petitioner's burden to show that the state court applied the
governing principle in an objectively unreasonable manner.
*Price*, 538 U.S. at 641.

It is not enough that the federal court conclude, in
its independent judgment, that the state court's decision was
incorrect or erroneous: A petitioner "must show that the state

---

[9] Unless otherwise noted, when quoting judicial decisions this order
accepts all alterations and omits all citations, footnotes, and internal
quotation marks.

16

court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Carmichael v. Chappius*, 848 F.3d 536, 544 (2d Cir. 2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

## IV.  Discussion

McClinton raises four claims in his petition, all of which he raised on direct appeal to the Second Department.  *See* Pet. 5.  His petition incorporates his brief to the Second Department by reference.[10]  *See id.* at 7-8.  We review these claims in turn.

### A.  *Brady* Challenges

McClinton argues that the prosecution improperly delayed the identification of four exculpatory witnesses, and improperly declined to identify the fifth witness — Jappa — at all.  Those failures, he contends, violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963).

McClinton exhausted this claim in state court.  The Second Department held that "the People did not violate their

---

[10] The Court therefore cites the petition and the appellate brief throughout this opinion.  District courts in this circuit have routinely permitted this kind of incorporation-by-reference, at least in cases involving *pro se* petitioners.  *See, e.g.*, *Lopez v. Sanders*, 302 F. Supp. 2d 241, 245 n.3 (S.D.N.Y. 2004); *Marino v. Berbary*, No. 06-CV-2728, 2007 WL 14561, at *1 n.1 (E.D.N.Y. Jan. 3, 2007).

obligations under [*Brady*] by improperly withholding or delaying disclosure of information about five witnesses." *McClinton*, 180 A.D.3d at 713.  The panel explained that as to the four identified witnesses (Gulley, Moye, Thomas, and a teenage eyewitness named Ashley West), the defense had been provided with their names "as well as additional contact information or access," and that "there [wa]s no indication that earlier disclosure might have had any effect on the outcome of the trial." *Id.*  As to the fifth witness (Jappa) — who identified Capers as a shooter — the Second Department explained that because McClinton was charged "on an acting-in-concert theory, there is no reasonable possibility that disclosure of that witness would have changed the outcome of the trial." *Id.* at 714.

McClinton must show that this decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) (on habeas review, a federal court looks to the last reasoned state-court decision).

The relevant clearly established law is *Brady* and its progeny.  In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  Evidence is "favorable to the accused" if it tends to exculpate the defendant or impeaches the credibility of the government's witnesses.  *See United States v. Bagley*, 473 U.S. 667, 676-77 (1985).  And evidence is material if there is a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).  The reasonable probability standard is met when suppression of evidence "undermines confidence in the outcome of the trial."  *Bagley*, 473 U.S. at 678.

1.   Lael Jappa

Of the five witnesses whose names or contact information McClinton contends the People suppressed, only one was never revealed in state court: Lael Jappa.[11]  As noted above, Jappa testified (for the People) that he saw Capers shoot at the bus, that he saw McClinton take Capers' gun, and that — after he

---

[11]  In August 2024, McClinton filed a motion to amend his petition, contending that Jappa had recanted his trial testimony.  ECF No. 18. Ultimately, after consulting with appointed counsel, McClinton did not so amend.  ECF No. 28.  The Court therefore does not consider the alleged recantation.

turned to run — he heard "about three" more shots.  Jappa 227:1-230:16.  McClinton argues that Jappa's testimony identifying Capers as the shooter tended to exculpate him, Pet. Mot. to Compel 2-3, a theory both Justice Lasak and the Second Department rejected.  *McClinton*, 180 A.D.3d at 714.

    *Brady* and its progeny require a three-step analysis. *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  The state violates *Brady* when (1) it suppresses evidence, (2) the evidence is "favorable to the accused," and (3) the evidence is material, such that its omission prejudices the defendant.  *Id.* at 281-82.  Here, we train our focus on the last two elements.  We first ask whether the information withheld was exculpatory, or "favorable to [the] accused."  *Brady*, 373 U.S. at 87.  If so, we ask whether the withheld evidence was *material* — that is, whether there is a "reasonable probability" that the verdict "would have been different" if the information had been disclosed.  *Cone*, 556 U.S. at 469-70.  As discussed below, this Court cannot find a violation of clear Supreme Court precedent in the state appellate court's conclusion of immateriality.  That determination forecloses relief on this claim.

    Before reaching the materiality issue, however, it is worth pausing to address the respondent's argument that, because McClinton was charged with acting in concert during the shooting, Jappa's pretrial statements were not "favorable to"

McClinton.  In essence, respondent argues that the combination
of Jappa's name, his statement to the N.Y.P.D. that he could not
identify the shooter, and his later identification of Capers
(without any reference to McClinton) is not exculpatory under
*Brady*.  This Court will not endorse that claim.

To be sure, the acting-in-concert charge provides *some*
support for the respondent's contention.  It is true, for
example, that the prosecution expressly declined, at trial, to
stake out a position on who fired the bullet that killed
Robinson.  Tr. 20:25-21:6.  And *Brady* itself acknowledged that
evidence of an accomplice's guilt will not *necessarily* exculpate
a defendant charged under a theory of accomplice liability.  373
U.S. at 88.[12]

At the same time, McClinton's prosecutor asked the
jury to conclude that McClinton fired at the bus "over and over
again."  Tr. 15:5-9.  Jappa's trial testimony may have supported
this conclusion, but his prior statements to the N.Y.P.D. and
his identification of Capers in a photo array can easily be read
to cut against it.  Evidence may be "favorable to an accused"
when it undermines a key aspect of the prosecution's theory of a
case, even if that aspect is not required to prove an element of

---

[12] McClinton does not argue that Jappa's testimony was material to
*punishment*, or that his testimony was suppressed at sentencing.  *Brady v.
State*, 174 A.2d 167, 172 (Md. 1961), *aff'd sub nom. Brady v. Maryland*, 373
U.S. at 91 (finding that suppressed evidence was material to punishment and
remanding for a new trial on punishment alone).

the charged crime.  Moreover, evidence can be consistent with both the prosecution *and* defense theories of the case.  *See United States v. Mahaffy*, 693 F.3d 113, 130 (2d Cir. 2012) (evidence may be subject to *Brady* when it has both incriminating and exculpatory aspects).  So, at a minimum, the prosecution must have realized by the time of trial that Jappa's prior statements would be useful fodder for impeachment on cross-examination.  *See Bagley*, 473 U.S. at 676-77; *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

Still, there is the question of materiality.  And the trial record does not permit finding that the state courts acted unreasonably in rejecting the conclusion that refusal to disclose Jappa's name prejudiced McClinton.  Another eyewitness — Payne — gave more damaging trial testimony than Jappa did, and Payne's assertion is not the subject of any claim here, under *Brady* or otherwise.  And McClinton's own admission that he fired a gun in the vicinity of the bus constituted powerful evidence of his guilt, even if he maintained that he fired into the air.  Again, McClinton makes no claim here that this admission was somehow tainted.

Furthermore, the prosecution did go *some* part of the way towards mitigating its refusal to disclose.  Jappa testified at trial that he saw "Mel [Capers] shooting a gun" at the bus, which is the same evidence recorded in the 710.30 notice.  Jappa

226:24-227:4; 710.30 Notice 1.  And Jappa admitted, both on
direct- and cross-examination, that he had "lied" to police
officers when first interviewed, *e.g.*, Jappa 276:13-14, even if
the defense could not confront him with his relatively
definitive prior statement that he "did not see who was
shooting" during the critical time period.  *See* ECF No. 16-2.

Ultimately, because defense counsel was still able to
impeach Jappa's credibility on cross-examination by reference to
his May 2013 statements, the Court cannot conclude that the
state's nondisclosure was sufficient to "undermine[] confidence
in the outcome of the trial."  *Bagley*, 473 U.S. at 678; *cf.*
*United States v. Hunter*, 32 F.4th 22, 34 (2d Cir. 2022)
(nondisclosure of additional impeachment evidence does not
violate *Brady* where the evidence "merely furnishes an additional
basis on which to impeach a witness whose credibility has
already been shown to be questionable").

*             *             *

As the foregoing discussion indicates, it is this
Court's firm view that prosecutors act at great risk — to a
defendant's rights, most importantly, but also to the integrity
of any conviction they may obtain — when they push the envelope
of what constitutes "favorable" evidence in the manner shown
here.  In the end, however, the failure to disclose Jappa's
name, his interview memoranda, and the report of his

identification cannot be said, when measured against the *Brady* framework established by the U.S. Supreme Court, to have undermined confidence in the outcome of McClinton's trial. *See Bagley*, 473 U.S. at 682. McClinton's *Brady* claim thus falls short as to Lael Jappa.

    2. <u>Janiah Gulley</u>

        Janiah Gulley attended the Sweet Sixteen and was aboard the same bus as Robinson when the shooting began. As noted above, she initially (according to Detective Faranda) identified McClinton's half-brother, Nate Parker, as the shooter. Faranda 883:2-4, 886:5-7. At trial, however, she testified that she could not recall the nature of this identification. Gulley 865:22-866:18. McClinton does not argue that the People failed to disclose Gulley's *statements* to the defense. Rather, he argued that government's failure to disclose her name until the April 14 pretrial conference — eleven days before opening statements — prejudiced him because his counsel had less time to prepare for her rather evasive testimony.[13] Pet.'s App. Br. 47.

        McClinton identifies no clearly established Supreme Court precedent holding that *Brady* requires the prosecution to

_____

[13] McClinton also challenges the government's failure to turn over Gulley's contact information. Pet.'s App. Br. 47. But as discussed in more depth below, no clearly established law requires the government to organize or facilitate meetings between defense counsel and witnesses with potentially exculpatory testimony.

disclose information about a witness early enough to guarantee
the defendant extensive preparation time.  And this omission
makes sense.  The Supreme Court has never clearly established,
or even really discussed at any length, the "timing of
disclosure *Brady* and its progeny require."  *Leka v. Portuondo*,
257 F.3d 89, 100 (2d Cir. 2001); *see also Ward v. Herbert*, 509
F. Supp. 2d 253, 260 (W.D.N.Y. 2007) ("Neither the Second
Circuit nor the Supreme Court has specified the timing of
disclosure that *Brady* requires, but it is clearly established
that disclosure prior to trial is not mandated.").  At most, the
Court has observed that *Brady* requires "less of the prosecution"
than the ABA Standards of Criminal Justice, which require
disclosure at the "earliest feasible opportunity."  *Kyles v.
Whitley*, 514 U.S. 419, 437 (1995) (citing ABA Standards for
Criminal Justice, Prosecution Function and Defense Function 3–
3.11(a) (3d ed. 1993)).

        To the extent a timeliness requirement exists, it
flows from the Second Circuit's mandate that a disclosure occur
with "sufficient time to afford the defense an opportunity for
use [of the evidence]."  *Leka*, 257 F.3d at 103.  But "[f]or
purposes of habeas review, 'clearly established Federal law'
refers to holdings of the United States Supreme Court, and not
an appellate court's interpretation or extension of such

holding[s]." *DeJesus v. Perez*, 813 F. App'x 631, 633 (2d Cir. 2020).

In any event, the timing of the state's disclosure of Gulley's name did not violate *Brady*. A "true *Brady* violation" requires not only that the evidence at issue be favorable to the accused, but also that it "have been suppressed by the State" at the defendant's expense. *Strickler*, 527 U.S. at 281-82. And in this circuit, "[e]vidence is not suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982).

Gulley's name was not suppressed under the standards outlined in *Leka* or *LeRoy*, even if those standards applied to a Section 2254 analysis. The prosecution disclosed Gulley's name early enough for the defense to call her. And although there were gaps in her recollection, Justice Lasak permitted the defense to supplement her testimony with testimony from Detective Faranda, who confirmed the defense-friendly fact that Gulley had identified Nate Parker as the shooter. Faranda 886:5-7. When an allegedly exculpatory witness "in fact testified for [the defendant] at trial and the jury heard and fully considered the exculpatory information," there can be "no suppression of exculpatory information . . . within the meaning

of *Brady*." *United States v. Barlow*, 732 F. Supp. 2d 1, 4 (E.D.N.Y. 2010).

    3.  <u>Supreme Moye</u>

       At the April 2016 pretrial conference, the People also informed the defense about Supreme Moye's potential testimony. Pretrial H'ing Tr. 5:1-6. In February or March 2016, the Queens District Attorney's Office learned that an incarcerated man named Terry Baboolal claimed to have information concerning the Q6 bus shooting. *Id.* at 4:15-21. An ADA interviewed Baboolal, who said that Moye told him (at some unspecified time) that he "fired some shots" at "that 6 bus shooting." *Id.* at 5:1-6. Moye's attorneys informed the prosecutor that he did not wish to speak with her office, and that he had denied making the alleged statement to Baboolal. *Id.* at 5:9-14.

       McClinton again argues that that the prosecution did not disclose Moye's statement in a timely manner. But again, no clearly established Supreme Court precedent required the People to disclose Moye's statement within a particular timeframe. *Leka*, 257 F.3d at 100. And in any event, the timeliness of the People's disclosure comported with *Brady*. Under *Brady*, the timeliness of a disclosure is assessed on a case-by-case basis: the closer to trial, the more thorough the disclosure must be. *Leka*, 257 F.3d at 100. Here, Moye's attorneys only agreed to speak with the prosecutor the week of the pretrial hearing.

Pretrial H'ing Tr. 5:9-14.  Within a week, the defense was informed about the potential *Brady* material and Moye's name. *Id.*  And the People's disclosure provided a detailed account not only of Baboolal's assertions, but also of Moye's position on those assertions.  By comparison, part of the constitutional violation in *Leka* was that the prosecution's eve-of-trial disclosure "consisted of nothing but [the witness's] name and perhaps his address."  257 F.3d at 101-02.  That bare-bones disclosure "afforded insufficient opportunity to use the information" because it required the defense to undertake significant investigatory work on an unreasonably truncated timeline.  *Id.* at 102.

Ultimately, defense counsel did not call (or subpoena) either Moye or Baboolal.  And absent any indication in the record that the timing of the prosecution's disclosure prejudiced the defendant, McClinton's *Brady* claim fails as to Moye.

4.    Richard Thomas

McClinton further argues that the prosecution failed to timely disclose information about Richard Thomas, the MTA bus driver.  According to the People's disclosure, Thomas had previously told police officers that the shooter wore a blue sweater.  Pet.'s App. Br. 7.  This was *Brady* material, McClinton

argues, because while Jappa was wearing a blue sweater that night, McClinton was wearing a white shirt. *Id.* at 38 n.6.

Three days before trial began, defense counsel said (for the first time) that he had not been able to contact Thomas, because "the name's too common for [defense counsel] to track it down." Second Pretrial H'ing 479:5-6, ECF No. 8-3. He requested that the People provide him with contact information for Thomas. *Id.* at 479:8-9. The prosecutor agreed to try but noted that she did not "know if [she] had recent contact for him." *Id.* at 479:25-480:1. At the end of the first day of trial, defense counsel again said he could not contact Thomas. Tr. 121:14-15. The prosecutor said she was still trying to do so. *Id.* at 121:17-19. On the penultimate day of the state's case, defense counsel handed up a subpoena for Thomas. *Id.* at 532:11-12. No further discussion was held on the record, but it appears that a subpoena issued, because Thomas testified two days later as part of the defense case. *Id.* at 815:7-14.

McClinton argues that because he could not contact Thomas earlier, counsel had been forced to "call a witness cold," and was "deprived of an adequate opportunity to use the exculpatory evidence." Pet.'s App. Br. 49. At the outset, this argument omits the fact that the government indicated that they did attempt to help defense counsel contact Thomas (though the record does not reveal if those efforts were successful). Tr.

121:17-19.  But more importantly, once again, McClinton
identifies no clearly established law requiring the prosecution
to arrange meetings between the defense and potential *Brady*
witnesses.  While defense counsel may have had trouble
contacting Thomas, it is a "well-established principle that the
government is not obliged under *Brady* to furnish a defendant
with information which he . . . can obtain himself" through
reasonable investigative effort.  *United States v. Pelullo*, 399
F.3d 197, 202 (3d Cir. 2005); *see also Weatherford v. Bursey*,
429 U.S. 545, 559-60 (1977) ("There is no general constitutional
right to discovery in a criminal case, and *Brady* did not create
one . . . .").

        Moreover, the government did not violate *Brady* as to
Thomas.  Again, "no *Brady* violation occurs if the defendant knew
or should have known the essential facts permitting him to take
advantage of any exculpatory evidence."  *United States v. Gaggi*,
811 F.2d 47, 59 (2d Cir. 1987).  Here, the People disclosed
Thomas's identity and his potentially exculpatory statement far
in advance of trial, a disclosure that ultimately enabled the
defense to examine him at trial.

        *Brady* does not require anything more.  For instance,
in *United States v. Grossman*, the government notified the
defense roughly two weeks before trial that witness who
testified before the grand jury "might have exculpatory

30

information." 843 F.2d 78, 82 (2d Cir. 1988). The government provided the witness's name but not his testimony. *Id.* The Second Circuit found that the government satisfied its *Brady* obligations, because its disclosure provided the defendant with the "essential facts permitting him to take advantage of any exculpatory evidence." *Id.* at 85. *Grossman*'s reasoning applies here. In fact, the government in this case provided *more* to the defense than the prosecution provided in *Grossman*, because they also detailed the nature of Thomas's potentially exculpatory statement.

McClinton's *Brady* claim fails as to Thomas.

5.    Ashley West

As with Thomas, McClinton claims that the prosecution violated *Brady* by failing to timely disclose contact information for Ashley West, a teenager who was at the scene of the crime.

On May 2, defense counsel requested for the first time that the People make West "available to him." Tr. 535:11-13. West had told a police officer that she saw "a person in a dark blue shirt pull[] out a black gun." *Id.* at 795:15-18. McClinton was wearing a white shirt, whereas Jappa and Payne were wearing blue shirts — thus, McClinton argued, her statement was exculpatory. Jappa 260:4-5; Galasso 478:1-2, 482:1-9. The People disclosed West's statement months in advance of trial. But despite extensive efforts ahead of trial, McClinton's

31

counsel was unable to contact her. *Id.* at 795:22-25. McClinton argues that by not also turning over West's contact information, the prosecution deprived him of "a meaningful opportunity to present a complete defense." Pet.'s App. Br. 50-51.

As an initial matter, the record does not suggest that defense counsel failed to contact West because of the government's non-disclosure. Rather, it indicates that West (or her parents) simply did not want to cooperate with the defense. In response to defense counsel's May 2 request, the prosecutor said that West — a minor — "[wa]s not under [er] control," and that West's "mother d[id] not want to be involved in this." Tr. 535:12-16. Indeed, despite a promise to contact defense counsel on the afternoon of May 2, *see id.*, West's mother never did so, *id.* at 794:25. Even when the People did (at the court's request) ultimately provide defense counsel with West's phone number one day before trial, *id.* at 796:11, he remained unable to contact her and opted to proceed without her testimony, *id.* at 861:3-9.

In any event, as noted above, there is no clearly established Supreme Court precedent establishing a precise timeframe in which the government must disclose *Brady* material. Rather, the pertinent question in the Second Circuit is whether the defense had an "opportunity to use the evidence when disclosure [wa]s made." *Leka*, 257 F.3d at 100. And because

the government disclosed West's identity and potentially exculpatory statement well in advance of trial, McClinton's *Brady* claim as to West fails on the merits anyway.  *See Grossman*, 843 F.2d at 85.

*          *          *

In sum, the government did not violate *Brady* with respect to any of the witnesses McClinton identifies. McClinton's *Brady* claims fail both individually and taken together.  *See Kyles*, 514 U.S. at 436 (allegedly suppressed evidence must be considered "collectively, not item by item").

**B.    Sufficiency of the Evidence**

McClinton argues, as he did before the Second Department, that his conviction was "based on legally insufficient evidence" because "the only evidence that directly connected [McClinton] to the murder was cooperating witness testimony," which is untrustworthy.  Pet.'s App. Br. 35.  This argument was properly exhausted in state court.  The Second Department rejected it on direct appeal, holding that the evidence at trial "was legally sufficient to establish the defendant's guilt beyond a reasonable doubt."  *McClinton*, 180 A.D.3d at 713.

At the outset, McClinton appears to be alluding to New York's rule that a defendant "may not be convicted of any offense upon the testimony of an accomplice uncorroborated by

corroborative evidence." N.Y. Crim Proc. § 60.22(1). There is
no equivalent federal rule. On the contrary, "even the
testimony of a single accomplice is sufficient to sustain a
conviction, provided it is not incredible on its face or does
not defy physical realities." *United States v. Truman*, 688 F.3d
129, 139 (2d Cir. 2012). Accordingly, the law governing
McClinton's insufficient claim is the Fourteenth Amendment's bar
on convictions based on insufficient evidence. *Jackson v.
Virginia*, 443 U.S. 307, 318 (1979).

     "*Jackson* claims face a high bar in federal habeas
proceedings because they are subject to two layers of judicial
deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per
curiam). The first layer of deference emanates from the limits
of the Due Process Clause of the Fourteenth Amendment. A
"reviewing court may set aside the jury's verdict on the ground
of insufficient evidence only if no rational trier of fact could
have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2
(2011) (per curiam). The second layer emanates from AEDPA. A
federal court may overturn a state court rejection of a
sufficiency challenge only "if the state court decision was
objectively unreasonable." *Id.* Accordingly, a district court
presented with a habeas petition "may not grant the writ unless
[it] conclude[s] that *no* reasonable court could have held that
*any* reasonable jury could have read the evidence to establish

34

[the] petitioner's guilt beyond a reasonable doubt." *Garbutt v. Conway*, 668 F.3d 79, 82 (2d Cir. 2012).

A person is guilty of murder in the second degree under New York law when, "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.25(1). And a person is guilty of criminal possession of a weapon in the second degree if either (1) "with intent to use the same unlawfully against another," they possess a machine-gun, disguised gun, or a loaded firearm, or (2) if, even absent a finding of intent, "such person possesses any loaded firearm" outside their home or place of business. *Id.* § 265.03.

Here, McClinton admitted to Detective Galasso that he was present at the scene with Capers, who fired into the bus before handing the gun to McClinton. Galasso 497:10-20, 519:19-21. He admitted that he "fire[d] the gun . . . two or three times into the air as [he and Capers] were running away." *Id.* at 519:11-21. And three witnesses — Payne, Bryant, and Jappa — testified at trial that they either saw McClinton shoot at the back of the Q6 bus with Robinson on board, saw him take the gun from Capers and then heard shots, or heard him confess to the shooting.

McClinton's only argument in the face of this evidence is that the witnesses lacked credibility because they

"implicated [McClinton] to deflect suspicion" from themselves and to receive leniency for their own crimes.  Pet.'s App. Br. 36.  But "the assessment of the credibility of witnesses is generally beyond the scope of review" under *Jackson*.  *Schlup v. Delo*, 513 U.S. 298, 330 (1995).  Viewing the evidence "in the light most favorable to the prosecution," *Jackson*, 443 U.S. at 319, McClinton cannot establish that no reasonable court could have held that any reasonable jury could have read the mutually reinforcing testimony of Bryant, Payne, and Jappa as establishing his guilt beyond a reasonable doubt.  *Garbutt*, 668 F.3d at 82.  McClinton's sufficiency claim therefore fails.

**C.    Inflammatory Evidence and Argument**

McClinton next argues that he was deprived of a fair trial for two reasons.  First, he argues that the trial court erred when it allowed "[t]he gratuitous introduction of inflammatory evidence about the victim's background and graphic depictions of her death."  Pet. 5.  And second, he argues that the court erred by allowing the prosecution, in opening and closing arguments, to "focus[] on that irrelevant evidence" and to imply "that the victim's family 'deserved' a guilty verdict." *Id.*

1.    Inflammatory Evidence

Before the Second Department, McClinton challenged the trial judge's admission of evidence about Robinson's youth, her

36

innocence, and the pain experienced by her friends and family. He wrote that those "heart-wrenching facts — that D'Aja was a beloved child who died in her best friend's arms, leaving behind a pool of brain matter and a blood-spattered umbrella — were not relevant to any material issue in the case and had no bearing on appellant's legal culpability," but were designed only to "inspire moral outrage." Pet.'s App. Br. 55.

The most recent clearly established Supreme Court precedent on this issue is *Andrew v. White*. There, the Court held that the Due Process Clause forbids the introduction of evidence "so unduly prejudicial that it renders the trial fundamentally unfair." *Andrew v. White*, 145 S. Ct. 75, 78 (2025) (per curiam) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). The *Andrew* Court declined to determine whether the evidence before it satisfied the fundamental-unfairness standard. But even if the evidence in that case *did* satisfy the applicable standard, it was clearly distinguishable from the evidence here. In *Andrew*, the prosecutors in a murder trial introduced a barrage of irrelevant and prejudicial evidence, ranging from details about the defendant's sexual partners, to "how often she had sex in her car," to the "underwear she packed for vacation." 145 S. Ct. at 79. Here, the evidence of Robinson's death — while certainly emotionally charged — was

neither personally disparaging nor unmoored from the facts of the underlying crime.

Ultimately, however, the Court need not determine whether the introduction of the above-mentioned evidence violated the rule established in *White*, because McClinton's argument is procedurally barred. The Second Department rejected McClinton's evidentiary argument on an adequate and independent state ground. A federal habeas court may not review the judgment of a state court that rests on a ground of procedural default that is "independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). A state-law ground is "independent" of federal law if the court's "reliance on state law" is "clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (quoting *Coleman*, 501 U.S. at 735). And it is "adequate" if it is premised on a state-law rule that is "firmly established and regularly followed" by courts of the state. *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423024 (1991)).

Here, the Second Department held that McClinton's argument was "unpreserved for appellate review because he failed to object at the time the evidence was introduced." *McClinton*, 180 A.D.3d at 714; *see also* N.Y. Crim. Proc. § 470.05 (setting out New York's contemporaneous objection rule). New York's

contemporaneous objection rule "is a firmly established and regularly followed New York procedural rule." *Downs v. Lape*, 657 F.3d 97, 102-04 (2d Cir. 2011). Accordingly, this claim is procedurally barred.

To overcome procedural default, a petition must either "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

McClinton has not demonstrated that cause existed for the default. To establish cause, he must "show that some objective factor external to the defense" — for example, that the "factual or legal basis for a claim was not reasonably available to counsel" — "impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). McClinton has offered no argument that cause existed for his procedural default, and the trial transcript reveals none.

He also has not shown that failure to consider his claim would result in a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). To satisfy the "miscarriage-of-justice exception," the petitioner is required to "establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found [him] guilty

beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536-37
(2006). McClinton has not met that burden here (and does not
contend otherwise in his papers).

    2.   <u>Improper Argument</u>

      McClinton also argues that his trial was unfair
because the prosecutor's "opening and closing arguments were
replete with remarks that had no legitimate purpose and served
only to further inflame the jury's outrage and sympathy."
Pet.'s App. Br. 56. Among other things, he points to references
to Robinson's age, to the violent nature of her death, and to
her mother's grief.

      This claim was properly raised before the Second
Department and exhausted in state court. The Second Department
held that McClinton's "contention that he was deprived of a fair
trial by remarks made by the prosecutor during her opening and
closing statements is without merit," and the "remarks did not
deprive the defendant of a fair trial." *McClinton*, 180 A.D.3d
at 714.

      The Supreme Court's decision in *Darden v. Wainwright*,
477 U.S. 168, 181 (1986), is the "clearly established Federal
law" that reviewing courts apply to claims of improper
summations under AEDPA. *Parker v. Matthews*, 567 U.S. 37, 45
(2012) (per curiam). Under *Darden*, "it is not enough that the
prosecutor's remarks were undesirable or even universally

40

condemned." 477 U.S. at 181. "[A] prosecutor's improper comments will be held to violate the Constitution only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker*, 567 U.S. at 45. Comments that do "not manipulate or misstate the evidence, nor . . . implicate other specific rights of the accused," are not so prejudicial as to warrant habeas relief. *Darden*, 477 U.S. at 182.

In *Darden*, despite denying habeas relief (even pre-AEDPA), the Supreme Court wrote that the prosecutor's comments deserved "the condemnation [they have] received from every court to review [them]." *Id.* at 179. For example, in arguing for the death penalty the *Darden* prosecutor said: Darden "shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash." *Id.* at 180 n.12. He referring to Darden as an "animal," telling the jury that he "wish[ed] that I could see [Darden] sitting here with no face, blown away by a shotgun." *Id.*

The statements at issue here are substantially less prejudicial than those made in *Darden*. There is no basis on which to conclude, under AEDPA, that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S.

at 103.  The prosecutor did not demonize McClinton directly, as in *Darden*.  Her statements describing the nature of Robinson's injuries — that a bullet "ripped into her brain" — did not manipulate or misstate the evidence.  Tr. 10:5-6.  And the prosecutor's references to Robinson's age were relevant to explain why she was at a Sweet Sixteen.

Even in the context of a direct appeal from a federal trial, "a prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation."  *United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995).  Furthermore, Justice Lasak's cautionary instruction to the jury — that "what an attorney says in summation is not evidence," Tr. 5:5-6 — weighs against finding that the prosecutor's comments ultimately infringed on any of McClinton's specific constitutional rights.  *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (holding, on a Section 2254 petition, that although a prosecutor's comments "overstepped the bounds of fair prosecutorial summation," that was ameliorated by the court's instruction "that the summations were not evidence").  Here, there is no reason to believe (especially upon deferential AEDPA review) that "the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181.  McClinton's claim therefore fails.

**D.    Excessive Sentence Challenge**

Lastly, McClinton argues that his sentence was excessive.  Pet.'s App. Br. 67.  He relies upon state law for this claim and has not cited the Eighth Amendment, under which an excessive punishment claim might otherwise be reviewable.  *See* Pet. 5; *see also* Pet.'s App. Br. 64-69 (exclusively citing New York State court decisions and statutes).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  This Court is not permitted to inquire into whether the Second Department was correct that under New York law, the "sentence imposed, as modified, was not excessive."  *McClinton*, 180 A.D.3d at 715.  McClinton's excessive sentence claim therefore fails.[14]

**V.    Conclusion**

For the foregoing reasons, McClinton's petition is denied.  Yet, as noted above, the Court believes that McClinton's *Brady* claim (with respect to Lael Jappa) presents a relatively close question.  It therefore concludes that

---

[14] Even if McClinton had raised an Eighth Amendment excessive sentence claim, that claim would fail.  "No federal constitutional issue is presented where, as here, the sentence is within the range proscribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam).  McClinton's sentence, as modified by the Second Department, runs twenty-five years to life.  *See McClinton*, 180 A.D.3d at 715.  He was convicted of murder in the second degree — a Class A felony under New York law.  N.Y. Penal Law § 125.25.  The maximum term of imprisonment in New York for Class A felonies is life.  *Id.* § 70.00(2)(a).  As a result, he has no federal constitutional claim.

"reasonable jurists could debate . . . whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  Accordingly, the Court will issue a certificate of appealability with respect to that claim pursuant to 28 U.S.C. § 2253(c)(1).

The Clerk of the Court is respectfully directed to enter judgment, close the case, and mail a copy of this order to McClinton.


SO ORDERED.


_/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge


Dated:   August 28, 2025
         Brooklyn, New York